IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RAINBOW ENERGY MARKETING CORPORATION, | § § § § § § § § § § § | |
| Plaintiff/Counter-defendant, | | |
| v. | | 1:21-CV-313-RP |
| DC TRANSCO, | | |
| Defendant/Counter-plaintiff. | | |

## ORDER

Before the Court are cross-motions for summary judgment filed by Plaintiff/Cross-Defendant Rainbow Energy ("Rainbow"), (Dkt. 110), Defendant/Cross-Plaintiff DC Transco, LLC ("DC Transco"), (Dkt. 114), and the corresponding responsible briefing. Having considered the parties' arguments, the evidence, and the relevant law, the Court will grant in part and deny in part both motions.

### I. BACKGROUND

This is a diversity contract dispute between Rainbow and DC Transco. The dispute arises from a series of financial transactions Rainbow made in February 2021, shortly before Winter Storm Uri reached Texas. (Am. Compl., Dkt. 41, at 1, 5).

Rainbow is a power trader. (Mortensen Dec., Dkt. 110-1, at 70). DC Transco is a limited liability corporation that owns the right to transmit power across the "DC Tie Line" (or "ERCOT East DC Tie), which that connects the electric grid operated by Southwest Power Pool, Inc. ("SPP") and the Texas energy Grid operated by the Energy Reliability Council of Texas ("ERCOT"). (*Id.* at 69–80; Transmission Agreement, Dkt. 110-1, at 566). On June 25, 2014, Rainbow and DC Transco executed an Energy Management Agreement ("EMA"). (Dkt. 114-1, at 4). The EMA is a service contract under which Rainbow provided certain services to DC Transco, including entering into

1

transactions for DC Transco to capitalize on price differentials between the SPP and ERCOT markets. (Mortensen Dec., Dkt. 110-1, at 70–71).

### A. The Disputed Transactions

On In February 10, 11, and 12 of 2021, in anticipation of Winter Storm Uri, Rainbow entered into a series of financial transactions—the disputed transactions—for the weekend and the following week. (Am. Compl., Dkt. 41, at 5–6; Mortensen Dec., Dkt. 110-1, at 15–17. The disputed transactions amount to approximately $20 million in losses. (Mortensen Dec., Dkt. 110-1, at 88). Among other things, the parties dispute whether Rainbow entered into the disputed transactions on behalf of DC Transco; whether the EMA requires Rainbow to seek explicit, affirmative approval of its trades in advance; and whether Rainbow sought or received approval for the transactions.

The disputed transactions were "electricity futures contracts," derivative financial products in which the parties agree on a price for electricity at a specified future date. (*Id.* at 72). Because the seller commits to providing the electricity on the agreed date, the seller is liable for the difference between the agreed price and the real-time price on the agreed date. (Rainbow's Mot. Summ. J., Dkt. 110, at 8). If the real-time price is lower, the transaction earns a profit; if the real-time price is higher, the transaction results in a loss.

In its Answer to DC Transco's Counterclaim, Rainbow admitted that it entered into the disputed transactions prior to notifying DC Transco that it had entered into the transactions. (Dkt. 109, at 5). However, Rainbow claims informed DC Transco of the disputed transactions the morning of February 12, 2021, and followed up later that day with a spreadsheet containing information about the trades. (Mortensen Dec., Dkt. 110-1, at 83–85). Rainbow's principal ERCOT trader, Mark Mortensen, declared that he spoke with Ayan Nandi, DC Transco's point person, on February 12 and 13, 2023, but that Nandi did not express concerns about the transaction at the time. (*Id.*). However, Rainbow admits that it did not include all the trades in the spreadsheets it sent DC

2

Transco on February 10 and 11, which detailed Rainbow's trading strategy for the week. (Rainbow's Mot. Summ. J., Dkt. 110, at 8). DC Transco claims it never approved the transactions and that it expressed its disapproval to Rainbow. (DC Transco's Mot. Summ. J., Dkt. 114, at 16). For example, DC Transco argues that on February 12 Nandi called Lloyd Nichols, a Rainbow employee, to express his disapproval, and that DC Transco continued to express its disapproval. (DC Transco's Resp., Dkt. 130, at 15).

**B. Procedural History**

Rainbow filed this suit on April 9, 2021, (Dkt. 1), and filed its First Amended Complaint on August 27, 2021, (Dkt. 41). Rainbow seeks a declaratory judgment pursuant to 28 U.S.C. § 221, declaring that: (1) Rainbow is not in breach of the EMA; (2) Section 3.1(d) of the EMA does not apply to the disputed transactions; (3) the EMA does not require advance approval of Rainbow's transactions; (4) to the extent that DC Transco has a right to approve the transactions, affirmative prior approval was not required; (5) DC Transco's failure to object to the disputed transactions constituted approval; (6) DC Transco is barred from claiming that the transactions were not approved; and (7) Rainbow has no obligation to pay any further amounts to DC Transco. (*Id.* at 13).

DC Transco filed a counterclaim for breach of contract and declaratory judgment, (Dkt. 16), which it amended on September 8, 2022. (Dkt. 102). DC Transco brings claims for breach of contract, including Rainbow's alleged failure to pay DC Transco amounts owed to it and assigning losses associated with the disputed transactions without seeking and receiving DC Transco's prior approval. DC Transco also raised a claim for breach of the implied covenant of good faith and fair dealing, alleging that Rainbow withheld information and wrongfully assigned loss-making transactions to DC Transco. Finally, DC Transco seeks a declaratory judgment that Rainbow's actions regarding the Disputed Transactions were not authorized, and that DC Transco is not responsible for the losses incurred as a result of the Disputed Transactions. (*Id.* at,

Rainbow asks the Court to grant summary judgment in its favor on DC Transco's counterclaim and related defense to Rainbow's request for declaratory relief. (Dkt. 110, at 5, 16–17). Meanwhile, DC Transco seeks summary judgment with respect to all claims asserted in Rainbow's First Amended Complaint, (Dkt. 41), and its own First Amended Counterclaims, (Dkt. 102). (Dkt. 114, at 4).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record

4

and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

Cross-motions for summary judgment "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004).

"The interpretation of an unambiguous contract is a matter of law; the interpretation of an ambiguous contract through extrinsic evidence of the parties' intent is a matter of fact." *S. Nat. Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir. 1986). "Thus, a district court may properly grant summary judgment when a contract is unambiguous, but may not grant summary judgment when a contract is ambiguous and the parties' intent presents a genuine issue of material fact." *Id.*

### III. DISCUSSION

An ambiguous contract "presents a genuine issue of material fact. *Pursue Energy*, 781 F.2d at 1081. Therefore, the Court must determine whether the EMA, on its face, is ambiguous as to the parties' claims. *See NRT N.Y. LLC v. Harding*, 16 N.Y.S.3d 255, 258 (N.Y. App. Div. 2015). ("The threshold question of whether a contract is unambiguous . . . [is an] issue[] of law within the province of the court.").

Rainbow and DC Transco dispute the terms of the EMA and its clarity. The parties focused on three EMA provisions: Section 3.1(d), Section 2.3(a), and Section 4.4(a)(vi). DC Transco argues that each of these provisions independently dictate that Rainbow needed DC Transco's

authorization and approval to enter financial transactions for which DC Transco would be responsible. (DC Transco's Mot. Summ. J., Dkt. 114, at 4–5). Rainbow argues that the disputed transactions are third-party transactions, but Section 3.1(d) only applies to transactions between Rainbow and DC Transco. (Rainbow's Mot. Summ. J., Dkt. 110, at 4–5). In the alternative, Rainbow claims that the EMA is ambiguous and the provisions at issue either do not apply or do not create strict advance approval requirements. (Rainbow's Resp., Dkt. 122, at 20–21).

But "clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Riverside S. Planning Corp. v. CRP/Extell Riverside*, 60 A.D.3d 61, 67 (N.Y. App. Div. 2008). Instead, the Court must now analyze the key provisions for ambiguity by "looking within the four corners of the document, not to outside sources." *Kass v. Kass,* 91 N.Y.2d 554, 566 (1998).

**A. The Transactions at Issue are "Other Transactions" Governed by Section 3.1(d).**

In context and by its plain language, Section 3.1(d) unambiguously applies to the disputed transactions. Section 3.1(d) of the EMA states the following:

> 3.1 <u>Project Rights and Responsibilities.</u> Project shall have the sole right and responsibility to:
>
> > . . . (d) approve all **Commodity Transactions and all Other Transactions** with respect to the Facility prior to such transactions being entered into, except to the extent that authority to enter into a Short-Term Commodity Transaction or Day-Ahead or Intraday Commodity Transaction has been delegated to [Rainbow] under Section 7.8.

(EMA § 3.1(d), Dkt. 114-1, at 19 (emphasis added)). Section 1.2 of the EMA defines "Commodity Transactions" by referencing other definitions, but in any case, commodity transactions refer to certain types of transactions "between [Rainbow] and [DC Transco]." (EMA § 1.2, Dkt. 114-1, at 10). Similarly, "Other Transaction" is defined as "any transaction or arrangement between [Rainbow] and [DC Transco] executed pursuant to this Agreement, other than a Commodity

Transaction, which may include agreements and transactions related to Risk Management Services and emissions credits." (*Id.* at 14).

Rainbow claims that the disputed transactions are neither "Commodity Transactions" nor "Other Transactions" because the disputed transactions were between Rainbow and third parties, not between Rainbow and DC Transco. (Dkt 110, at 11). In fact, Rainbow alleges that it has never engaged in transactions with DC Transco under the EMA. (*Id.* at 11–13; *see also* Mortensen Dec., Dkt. 110-1, at 10–11).

In turn, DC Transco argues that the disputed transactions are "Other Transactions." (Dkt. 114, at 22–23). In response to Rainbow's argument that no transactions occurred between DC Transco and Rainbow, DC Transco argues that Rainbow's third-party transactions were "Back-to-Back Contracts", and that DC Transco had to approve the mirror "Commodity Transaction" or "Other Transaction" be liable or to profit from the transaction. (DC Transco's Mot. Summ. J., Dkt. 114, at 11).

The Court agrees that characterizing the disputed transactions as "Other Transactions" is the only reasonable reading of the contract. Even if the disputed transactions originated as transactions between Rainbow and third parties, the EMA accounts for these sort of transactions by defining "Back-to-Back Contracts" as "transaction[s] or series of transactions between [Rainbow] and a Third Party that correspond(s) to, and mirrors the economic terms of, a Commodity Transaction or Other Transaction between [Rainbow] and [DC Transco] pursuant to the terms of this Agreement." (EMA § 1.2, Dkt. 114-1, at 9). In fact, the EMA only refers to financial transactions between Rainbow and third parties twice, both in the context of "Back-Back-Contracts." (*See* EMA § 1.2, 3.1(b), Dkt. 110-1, at 485–486 (defining "Back-to-Back Contract"); *Id.* § 3.1(b) at 495 (". . . to the extent that any transactions require [Rainbow] to enter into one or more transactions with a Third Party under a Back-to-Back Contract . . . .")). Given this context, transactions between Rainbow and a third party

7

made in pursuance of the EMA must translate into either a "Commodity Transaction" or "Other Transaction" via a "Back-to-Back Contract."

As DC Transco notes, "[t]he EMA does not provide a general definition of 'transaction.'" (Mot., Dkt. 114, at 22). Instead, the EMA defines only two types of transactions: "Commodity" and "Other." Read as the mirror of a "Back-to-Back Contract," the disputed transactions do not fall within the enumerated types of transactions under the Commodity Transactions definition. Accordingly, given that "Other Transactions" encompasses "any" transaction "other than a Commodity Transaction," the disputed transactions must be "Other Transactions."

Rainbow's insistence that no records exist of transactions between it and DC Transco is unavailing. Having determined that the contract is unambiguous on its face as to its applicability to the disputed transactions, the Court cannot and will not consider extrinsic evidence, such as the availability of records, to reach a different conclusion. *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 436 (N.Y. 2013)

### B. Did the EMA Require Prior Approval?

1. Section 3.1(d) Unambiguously Requires Prior Approval by DC Transco of Transactions by Rainbow with Third Parties on DC Transco's Behalf

The disputed transactions were "Other Transactions" under the EMA. Accordingly, Section 3.1(d) applies: DC Transco had the "sole right and responsibility" to approve the transactions "prior to such transactions being entered into." (Dkt. 114-1, at 19). The Court finds that the language is clear: prior approval by DC Transco was required.

"A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Pesstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009). The Court has found that Section 3.1(d) clearly applies to the disputed transactions and requires prior approval, and Rainbow has already admitted that it did not seek prior approval for the

8

disputed transactions, (Dkt. 109, at 5). Accordingly, the Court must find that Rainbow breached the EMA with respect to this section and grant summary judgment to DC Transco on this issue. The Court will now evaluate whether DC Transco had a duty to mitigate.

### C. Did DC Transco Fail to Mitigate?

A party who claims breach of contract has a duty to make reasonable efforts to minimize the injury. *Holy Properties Ltd., L.P. v. Kenneth Cole Prods., Inc.*, 661 N.E.2d 694, 696 (N.Y. 1995). Rainbow argues that even if Section 3.1(d) applies to the disputed transactions, it should not be liable for any additional payments because DC Transco failed to mitigate its damages. (Rainbow's Mot. Summ. J., Dkt. 110, at 16). According to Rainbow, "[h]ad [DC Transco] objected to the trades, Rainbow could have unwound them, substantially reducing the ultimate loss amounts." (*Id.*).

In response, DC Transco argues that Rainbow's argument is speculative because undoing the trades would have required a willing counterparty to buy back the futures contracts. (DC Transco's Resp., Dkt. 130, at 23). The parties also dispute whether a willing counterparty was available to buy back the futures contracts. In support of its argument, Rainbow presents the expert report of Edward A. Hirs III, which declares that Rainbow could have unwound the trades and reduce the losses. (Report, Dkt. 110-1, at 224–225). DC Transco did not dispute this expert testimony.

DC Transco does not dispute its duty to mitigate, nor did it dispute Rainbow's expert testimony. Rainbow has raised a genuine question of fact as to the issue of mitigation. Accordingly, the Court will deny summary judgment to DC Transco on the extent of liability.

2.

### IV. CONCLUSION

The Court has found that Section 3.1(d) clearly applies to the disputed transactions and requires prior approval, and Rainbow has already admitted that it did not seek prior approval for the

disputed transactions, (Dkt. 109, at 5). The Court also finds that Rainbow has raised an issue of fact as to whether DC Transco mitigated.

Accordingly, **IT IS ORDERED** that Rainbow Energy Corporation's Motion for Partial Summary Judgment, (Dkt. 110), is **DENIED**. **IT IS FINALLY ORDERED** that DC Transco, LLC's motion for partial summary judgment, (Dkt. 114), is **GRANTED IN PART**. DC Transco's motion is granted only with respect to the breach of contract claim and findings set out above.

**SIGNED** on January 13, 2023.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE